# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs December 2, 2003

## STATE OF TENNESSEE v. KENNETH RICHARD

**Direct Appeal from the Circuit Court for Tipton County**
**No. 4489   Joseph H. Walker, III, Judge**

**No. W2003-00928-CCA-R3-CD  - Filed February 5, 2004**

A Tipton County jury found the Defendant, Kenneth Richard, guilty of two counts of reckless endangerment and one count of vandalism. The trial court sentenced the Defendant to eleven months and twenty-nine days on each count, to run concurrently and to be served in the Tipton County Jail. The Defendant appeals, contending that the trial court erred when it failed to sentence him to probation. After reviewing the record, we find no reversible error and we, therefore, affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ALAN E. GLENN, JJ., joined.

Frank Deslauriers, Covington, Tennessee, for the appellant, Kenneth Richard.

Paul G. Summers, Attorney General and Reporter; Michael Moore, Solicitor General; J. Ross Dyer, Assistant Attorney General; Elizabeth T. Rice, District Attorney General; Walt Freeland, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION
## I. Facts

This case involves an incident between the drivers of two automobiles during which the Defendant broke the victim's windshield. The Tipton County Grand Jury indicted the Defendant on two counts of aggravated assault and one count of vandalism. A jury convicted the Defendant of two counts of reckless endangerment and one count of vandalism, all Class A misdemeanors. The trial court sentenced the Defendant to eleven months and twenty-nine days to be served in the Tipton County jail on each possession count and ordered that all the sentences run concurrently. The trial court then denied the Defendant's request for probation, and the Defendant appeals that judgment of the court.

The following proof was presented at the Defendant's trial: Laura Beth Downing testified that she was seventeen at the time of her encounter with the Defendant on December 17, 2001. Downing testified that, on that date, she was driving her thirteen-year-old brother to his Boy Scouts meeting at a local church, which was approximately one mile from her home. Downing stated that, while on the way to the church, she stopped at an intersection that was "a three-way stop," and, after stopping, she turned left. She said that when she turned left she heard "squalling tires" and thought the noise was from her own car. She stated that "when I got about halfway down this little side street to the church, I patted my brakes a little bit and the squealing stopped. And I [thought] 'Well, okay, I guess it was me,' and kept going." Downing stated that, shortly thereafter, she noticed a pair of truck headlights "blaring in my rearview mirror," and the truck would not "get off [the] tail" of her vehicle. Downing testified that she felt nervous but proceeded to the appropriate place to drop off her bother.

Downing testified that, while stopped at the drop off point, she noticed the truck go "off into the grass of the churchyard" and "almost hit an embankment," and she knew that there was a problem. She testified that the truck was white and "really big," similar to a "work truck." Downing stated that she told her brother not to get out of the car because it appeared that "something wasn't right." She stated that the truck then came "barreling up behind" her vehicle, and she "took off" in her car toward the front of the church. She testified that she drove to the front of the church and parked underneath a street lamp.

Downing testified that, after she parked under the street lamp, she saw the white "work truck" pulling up on the passenger's side of her car. She stated that she could hear the Defendant cursing while still in his truck. Downing stated that the Defendant then "slammed his door three times into the passenger's side door" of her car. She stated that, while the Defendant was "slamming" his door into her passenger's side door, he "kept screaming 'Get out of the car, you M-F. Get out of the car, you S-O-B.'" Laura Downing testified that the Defendant then got out of his truck and "busted the windshield" of her vehicle. Downing said, "[W]hen I looked at the glass, there was just a small hole formed in the center, and I thought 'Oh, my God, he's shooting at us.' And then he hit it again, and I realized that's not a gun."

Downing testified that shortly after the Defendant broke her windshield she got out of the car because "if he was going to come kill somebody . . . I'd rather it be me [than] my little brother." After she exited the car, another man came up to her and told her to get back in her car and go home. The man then approached the Defendant and told him to leave her alone because she was "just a kid."

On cross-examination, Downing testified that she was not harmed by the incident and did not have to go to a doctor. She also testified that, after she left, a mother of another boy scout found a cell phone and a box of nails in the parking lot. Downing testified that she thought that the Defendant used the box of nails to break the windshield. She stated that the whole incident lasted approximately ten minutes.

Doug "Rudy" Downing testified that on December 17, 2001, his sister was driving him to

his Boy Scout troop's Christmas party when he heard "tires squealing behind" his sister's car and saw "bright lights" from the car behind them. He testified that, when he and his sister got to the church, the "headlights just kept coming on after us," so his sister "pulled up a little further." Doug Downing testified that, once his sister stopped the car, "somebody pulled up beside [us] and just started banging their [driver's side] door into my door three times." He stated that he heard the driver "cussing" at him and his sister. Doug Downing testified that the other vehicle looked like a "white . . . work truck." He stated that he saw the Defendant exit the vehicle and start "beating the windshield in my face," so to protect himself Doug Downing covered his head. Doug Downing testified that a short time later, he saw the Defendant throw "something white down," which was later determined to be a box of nails.

Doug Downing testified that the Defendant began walking around looking toward the driver's side of the vehicle and that his sister got out and asked the Defendant what she did. He stated that a younger man then pulled up behind his sister's car and "walked out and told him off, and told my sister to just take us back [home]. . . ." Doug Downing stated that his sister got back in the car and drove home.

Phyllis Ellen Smith testified that she knew the Downings because Rudy Downing attended Boy Scouts with her two sons. She stated that on December 17, 2001, she saw the Downings pull into the church parking lot while being followed by a truck. Smith stated that the truck was white and that the driver of the truck was driving in a "crazy" manner. Smith stated that the truck blocked the Downings in and "somebody" got out of the driver's side and was "hollering and screaming words . . . and calling [Laura Downing] names" while hitting the passenger side window. Smith testified that another vehicle then pulled up and the driver of that vehicle got out and yelled, "Come on, let's get the – out of here." Smith stated that later that evening one of the Boy Scouts handed her a box containing nails and a cell phone. Smith testified that she gave these items to Laura Downing's mother.

Andy Garcia, an officer with the Tipton County Sheriff's Department, testified that he responded to the call involving this incident and interviewed Laura and Rudy Downing. The officer stated that the Downings described the man who broke their windshield and gave him a box of nails and a Nextel phone found in the church parking lot. From the phone, the officer obtained the name and address of the Defendant. The officer stated that he went to the Defendant's home and that the Defendant fit the general description that the Downings provided. Officer Garcia stated that, at the Defendant's home, he observed a white pickup truck with "ladder racks and construction gear on it." The officer testified that the headlight on the driver's side of the truck was broken and that there was paint on that area of the truck that "matched" the paint on Laura Downing's vehicle.

Clyde Douglas Downing, Laura and Rudy Downing's father, testified that between seven and eight o'clock during the evening of December 17, 2001, he received a call from his daughter, who he described as "pretty well hysterical." Clyde Downing stated that, after receiving this call, he left work to meet his daughter because he knew there was a problem. Clyde Downing testified that his daughter told him what happened, and he saw that the windshield of his daughter's car was broken. He also stated that there was some damage to the vehicle's right front door and fender and the front

bumper. Clyde Downing testified that he paid $266 to have the windshield repaired.

The Defendant called Steven Dean Lumley, who is engaged to the Defendant's daughter, to testify. Lumley testified that he and the Defendant work together and sometimes drive a white, one-ton truck to work. Lumley stated that he was driving the white truck on the night of December 17, 2001, and was following Laura Downing's vehicle. Lumley stated that he was driving the truck because the Defendant did not have a drivers' license. He testified that he and the Defendant were being followed by the Defendant's son, Christopher Richard. Lumley stated that Laura Downing was traveling only twenty-five miles an hour and that the Defendant told him to pass her car. Lumley stated that, when he attempted to pass Downing's car, she turned left and he almost "broadsided" her, so he "slammed the brakes on . . . and then followed them to the church to find out what was going on." Lumley testified that, when they pulled into the church, the "girl got out, and [the Defendant] just stood on the passenger's side of the truck, wondering why she [cut] us off." Lumley stated that Richard pulled up and told them to "quit arguing and get back in the truck and go home."

Lumley stated that neither he nor the Defendant smashed the truck door into the passenger's side door of Laura Downing's vehicle. He stated that the Defendant never left the passenger's side of the truck and that the "most that he did" was "g[et] out, [open] the door and st[and] there." On cross-examination, Lumley stated that the windshield of Laura Downing's car was unbroken when he saw it and he had no idea how it was broken. Lumley stated that he did not drive over the grass in the church and that he had no idea why Smith would say that he was driving in a "crazy" manner.

Christopher Richard, the Defendant's son, testified that on December 17, 2001, he pulled into the church and saw "some arguing" between his father and Laura Downing. He testified that when he got there his father was standing beside the truck, on the passenger's side, and that Lumley was inside the truck. Richard stated that he told Laura Downing to "go on home" and "told [the Defendant] to stop arguing . . . [a]nd everybody got in their vehicles and left."

Based upon this evidence, the jury found the Defendant guilty of reckless endangerment of Laura Downing and reckless endangerment of Rudy Downing, both lesser-included offenses of aggravated assault. The jury also found the Defendant guilty of vandalism.

At the sentencing hearing, the pre-sentence report indicated that the Defendant had a prior felony conviction for Driving Under the Influence of an Intoxicant ("DUI"), based upon numerous prior DUI convictions. The report also indicated that the Defendant had a previous conviction for assault.

Clyde Douglas Downing testified again at the sentencing hearing. He stated that the incident had affected his children, "[They] [c]an't get away from it. . . . It's with them 24 hours a day, seven days a week." He stated that his daughter refuses to take her brother to any Boy Scouts meetings and that she gets moody and agitated very easily when other drivers "cut her off." He also stated that she gets very nervous. Clyde Downing testified that his son is quiet but is "hiding a tremendous amount of anger." On cross-examination, Clyde Downing testified that these were his personal observations

and that he had not sought medical treatment for either of his children.

Cynthia Rene Richard, the Defendant's wife, testified that she has been married to the Defendant for almost seven years. She stated that he had some history of alcohol use but that he sought rehabilitation for this in 1996 and has not had any alcohol problems since then. Cynthia Richard testified that the Defendant was the sole provider for her family and that if he was sentenced to extensive jail time she would be unable to keep their home. She testified that, if the Defendant was sentenced to probation, she would ensure that he abided by the terms of his sentence.

Prior to sentencing the Defendant, the trial court noted that all three of his convictions were for class A misdemeanors. The trial court then found:

> I have considered the presentence report, the principles of sentencing, the testimony heard here today, [and] the Victim Impact Statements that are attached to the presentence report.
>
> The Court finds, under T.C.A. 40-35-114, that enhancing factor number 1 applies; that is, the [D]efendant has multiple convictions in addition to those necessary to establish the appropriate range, including a driving on revoked license offense in 2001, driving under the influence in '94 and '92, a simple assault in '92, driving under the influence in '91 and '90, and other convictions before that.
>
> The Court further finds that . . . mitigating factor number 1, under T.C.A. 40-35-113, applies, in that there was no serious bodily injury done to anyone. With regard to the results of the offense, however, there was the threat of serious bodily injury in the actions of the [D]efendant, as found by the jury, after the victims in the matter had pulled over, and the [D]efendant's enraged actions with regard to the vehicle in breaking the windshield.

Thereafter, the trial court sentenced the Defendant to eleven months and twenty-nine days in the Tipton County jail for each count, to be served concurrently and at seventy-five percent. The Defendant filed a Motion for Suspended Sentence or Alternative Sentencing, which the trial court denied. The trial court found:

> [T]he [D]efendant has multiple misdemeanor convictions, including a prior conviction for assault. Probation has been tried a number of times without success of modification of further criminal behavior. Probation is denied due to the seriousness of the offenses; his behavior in this case was outrageous and deserves some incarceration. The [D]efendant has shown no remorse.

Thereafter, the Defendant filed a timely appeal, contending that the trial court erred when it did not sentence him to probation.

## II. Analysis

The Defendant contends that the trial court erred because it failed to consider all the relevant factors when it denied the Defendant probation and that, under the facts and circumstances of this case, the Defendant should have been sentenced to probation. When a defendant challenges the length and manner of service of a sentence, it is the duty of this court to conduct a de novo review of the record with a presumption that "the determinations made by the court from which the appeal is taken are correct." Tenn. Code Ann. § 40-35-401(d) (2003). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ross, 49 S.W.3d 833, 847 (Tenn. 2001); State v. Pettus, 986 S.W.2d 540, 543 (Tenn. 1999); State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). The presumption does not apply to the legal conclusions reached by the trial court in sentencing a defendant or to the determinations made by the trial court that are predicated upon uncontroverted facts. State v. Dean, 76 S.W.3d 352, 377 (Tenn. Crim. App. 2001); State v. Butler, 900 S.W.2d 305, 311 (Tenn. Crim. App. 1994); State v. Smith 891 S.W.2d 922, 929 (Tenn. Crim. App. 1994). In conducting a de novo review of a sentence, we must consider: (a) any evidence received at the trial and/or sentencing hearing; (b) the presentence report; (c) the principles of sentencing; (d) the arguments of counsel relative to sentencing alternatives; (e) the nature and characteristics of the offense; (f) any mitigating or enhancement factors; (g) any statements made by the defendant on his or her own behalf; and (h) the defendant's potential or lack of potential for rehabilitation or treatment. See Tenn. Code Ann. § 40-35-210 (1997 & Supp. 2002); State v. Taylor, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001). The party challenging a sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401 (2003), Sentencing Commission Cmts.

The Defendant was convicted of three class A misdemeanors. In misdemeanor sentencing, the sentence imposed must be specific and consistent with the purposes and principles of the Criminal Sentencing Reform Act of 1989. Tenn. Code Ann. § 40-35-302(b) (2003). A percentage of not greater than seventy-five percent of the sentence should be fixed for service, after which the Defendant becomes eligible for "work release, furlough, trusty status and related rehabilitative programs." Tenn. Code Ann. § 40-35-302(d). The misdemeanant, unlike the felon, is not entitled to the presumption of a minimum sentence. State v. Creasy, 885 S.W.2d 829, 832 (Tenn. Crim. App. 1994). However, in determining the percentage of the sentence to be served in actual confinement, the court must consider enhancement and mitigating factors, as well as the purposes and principles of the Criminal Sentencing Reform Act of 1989, and the court should not impose such percentages arbitrarily. Tenn. Code Ann. § 40-35-302(d). Our supreme court has observed that "[i]n addition to the statutory considerations for issuing sentences of confinement, the misdemeanor sentencing statute merely requires a trial judge to consider enhancement and mitigating factors when calculating the percentage of a misdemeanor sentence to be served in confinement." State v. Troutman, 979 S.W.2d 271, 274 (Tenn. 1998).

A defendant is eligible for alternative sentencing if the sentence actually imposed is eight years or less. Tenn. Code Ann. § 40-35-303(a) (2003). While certain Class C, D, or E offenders are entitled to a presumption in favor of probation, Tennessee Code Annotated section 40-35-102(6), the Defendant is entitled to no such presumption regarding his misdemeanor sentences as he was

convicted of three Class A misdemeanors. See State v. Williams, 914 S.W.2d 940, 949 (Tenn. Crim. App. 1995). In determining whether to grant or deny probation, the trial court may consider the following: the circumstances of the offense; the defendant's criminal record; background and social history; the defendant's physical and mental health; the deterrent effect on other criminal activity; and the likelihood that probation is in the best interests of both the public and the defendant. State v. Parker, 932 S.W.2d 945, 958 (Tenn. Crim. App. 1996). The Defendant bears the burden of establishing suitability for probation. Tenn. Code Ann. § 40-35-303(b); Ashby, 823 S.W.2d at 169. Sentences involving confinement should be based upon the following considerations:

> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
> (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or
> (C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

Tenn. Code Ann. § 40-35-103 (2003).

If our review reflects that the trial court followed the statutory sentencing procedure, imposed a lawful sentence after having given due consideration and proper weight to the factors and principles set out under the sentencing law, and made findings of fact that are adequately supported by the record, then we may not modify the sentence, even if we would have preferred a different result. Sate v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991). In the case under submission, the record demonstrates that the trial court properly considered relevant sentencing principles. Accordingly we apply the presumption that the trial court's sentencing determinations are correct. See Tenn. Code Ann. § 40-35-401(d).

In determining the Defendant's sentence, the trial court found that one enhancement factor, the Defendant's extensive history of criminal conduct, and one mitigating factor, the lack of serious bodily injury, applied. The court then denied the Defendant's subsequent request for a suspended sentence, or probation, based upon its findings that : (1) the Defendant has multiple misdemeanor convictions, including a prior conviction for assault; (2) probation was tried a number of times without "success of modification of further criminal behavior;" (3) the Defendant's behavior in this case was outrageous; and (4) the Defendant has shown no remorse. There is no evidence in the record to preponderate against these findings, and we, therefore, affirm the trial court's judgments.

### III. Conclusion

In accordance with the foregoing, we conclude the trial court committed no reversible error when it denied the Defendant's request for probation. Therefore, the judgments of the trial court are AFFIRMED.

_____
ROBERT W. WEDEMEYER, JUDGE